IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JASON K. YODER and MARILYN YODER, *his wife*,<br><br>Plaintiffs,<br><br>vs.<br><br>THE SPORTSMAN'S GUIDE, INC., *d/b/a GUIDE GEAR*; and **DIRECT OUTDOOR PRODUCTS, LLC**,<br><br>Defendants. | 2:14-cv-937 |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court are DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 30) and DEFENDANTS' MOTION TO PRECLUDE JAMES GLANCEY FROM TESTIFYING AT TRIAL (ECF No. 31) filed by Defendant The Sportsman's Guide, Inc. d/b/a Guide Gear and Defendant Direct Outdoor Products, LLC. Plaintiffs Jason K. Yoder and Marilyn Yoder filed briefs in opposition (ECF Nos. 35, 36); Defendants filed reply briefs (ECF Nos. 39, 40). The factual record has been developed via the parties' appendices and exhibits. The Court heard oral argument on the motions on October 8, 2015. Accordingly, the motions are ripe for disposition.

### I.    Background

Before addressing the substance of the pending motions, the Court must apparently pause to explain the Local Rules to counsel. The Local Civil Rules of Court of the United States District Court for the Western District of Pennsylvania effective February 1, 2013 govern all applicable proceedings brought in this Court. LCvR 1.1.C. Such rules carry the force of law and bind the litigants as well as the court. *See generally* 12 CHARLES ALAN WRIGHT, ARTHUR R.

MILLER & RICHARD L. MARCUS, 12 Federal Practice and Procedure § 3153 (2d ed. & Suppl. April 2013).

Local Rule 56 requires that a motion for summary judgment be accompanied by "[a] **separately filed** concise statement setting forth the facts essential for the Court to decide the motion for summary judgment, which the moving party contends are undisputed and material, including any facts which for purposes of the summary judgment motion only are assumed to be true." LCvR. 56.B (emphasis added). Defendants have failed to comply with the technical aspect of this rule – namely, that they separately file a concise statement. Be that as it may, Defendants' memorandum in support of their motion for summary judgment includes seventeen "separately numbered paragraphs" in which they "cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact" in accordance with Local Rule 56.B.1.

For their part, however, Plaintiffs fail to comply with the Local Rules in both form and substance by only citing to their Complaint in their brief in opposition to Defendants' motion for summary judgment.[1] Of course, "[m]erely citing to the pleadings is insufficient to support a motion for summary judgment." *Bethea v. Roizman*, No. CIV. 11-254 JBS/JS, 2012 WL 4490759, at *7 (D.N.J. Sept. 27, 2012).

Local Rule 56.C.1 instead requires that the opposing party shall file a Responsive Concise Statement – that is, a separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by:

> a. admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material;
> b. setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to

---

1. Plaintiffs do cite to the expert report of James L. Glancey, Ph.D., P.E. and Jack R. Vinson, Ph.D., P.E., in their brief in opposition to Defendants' *Daubert* motion.

whether it is undisputed or material), with appropriate reference to the record; and

  c. setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the Court to determine the motion for summary judgment.

*See* LcVR 56.C.1.a.-c.  The Local Rules also permit the moving party to reply to the opposing party's submission in opposition to the motion for summary judgment.  *See* LCvR 56.D.

Local Rule 56.E sets forth the consequences for failing to comply with these requirements.  *See* 56.E.  As the Rule states:

Alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.

*Id.*  It is within the Court's discretion to impose this penalty – as harsh as it may be – for violation of local rules.  *See Kabacinski v. Bostrom Seating, Inc.*, 98 F. App'x 78, 82 n.3 (3d Cir. 2004) (quoting *United States v. Eleven Vehicles, Their Equipment & Accessories*, 200 F.3d 203, 214 (3d Cir. 2000) ("Local court rules play a significant role in the district courts' efforts to manage themselves and their dockets . . . it is not an abuse of discretion for a district court to impose a harsh result, such as dismissing a motion or an appeal, when a litigant fails to strictly comply with the terms of a local rule."))).  After all, the Local Rules are not suggestions that may be disregarded at counsel's whim or convenience; they instead represent mandatory requirements which establish a fair and level playing field for all parties.

Although the Local Rules permits the Court to set aside these procedures, it has no legitimate reason to do so.  *See* LCvR 56.A. ("The procedures that follow shall govern all motions for summary judgment made in civil actions unless the Court, on its own motion, directs otherwise, based on the particular facts and circumstances of the individual action.").  In fact, "a

district court can depart from the strictures of its own local procedural rules" only "where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his detriment." *United States v. Eleven Vehicles, Their Equip. & Accessories*, 200 F.3d 203, 215 (3d Cir. 2000).  Yet neither prong is met in this case.

To be sure, "District Courts are not required to search through the record for evidence to support a party's assertion of the existence of a genuine issue of material fact."  *McCann v. Kennedy Univ. Hosp., Inc.*, 145-46 (3d Cir. 2014).  In other words, "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"  *Id.* at 146 (quoting *American Family Life Assur. Co. of Columbus v. Biles,* 714 F.3d 887, 896 (5th Cir. 2013)).  That is instead the job of counsel.  Accordingly, the Court will deem those uncontroverted facts in the moving parties' filing as admitted for purposes of ruling on the pending motions, which it will now address.

### A.  The Ladderstand

In October 2013, Plaintiff purchased a 2013 model-year Direct Outdoors Product, LLC – Guide Gear Marksmen 17.5 foot Deluxe 2-Man Ladderstand (the "Ladderstand"), which is used to hunt game from an elevated position.[2]  Along with the Ladderstand, Mr. Yoder received a full body safety harness, written warnings and instructions, and a safety DVD with his purchase.

After receiving the Ladderstand, Mr. Yoder read the written warning and instructions included in the box, which he claims to have understood.  The user manual provides several warnings, which include the following:

---

2.  The design of the Ladderstand is apparently similar to millions of other two-man treestands that have been sold over the past fifteen years: it is comprised of a ladder connected to a platform where the user sits.  In fact, the Ladderstand was designed and manufactured to comply with applicable TMS/ASTM Standards, which a third-party laboratory verified with testing prior to its sale.

**[ ] You must completely read, understand, and follow the warnings and instructions contained in this manual and enclosed DVD. Failure to do so may result in serious injury or death!**

**[ ] When hunting from a treestand, falls can occur any time after leaving the ground causing injury or death! Therefore, you must always wear a fall arrest system (FAS) comprising a full body harness at all times after leaving the ground.** You must stay connected at all times after leaving the ground while using treestands. Single safety belts and chest harnesses are no longer allowed and should never be used. If you are not wearing a full body harness properly attached to the tree that is protecting you from a fall, do not leave the ground.

[ ] Read and understand all of the manufacturer's Warnings and Instructions and use all safety devices provided. Contact the manufacturer for any questions. Failure to do so could result in injury or death . . . .

[ ] **Three adults or more** are required to install and/or take down a ladder treestand.

**The criss-cross straps and stabilization bar (devices) must be attached and installed correctly, with two persons stabilizing the ladder, before climbing to the platform the first time**. If you are not wearing a full body harness to protect you from a fall, do not leave the ground.

Defs.' Ex. 3 at 2-3 (emphasis in original).[3] After three pages of "Important Warnings and Notices," the user manual sets forth a parts list with an exploded view, pictures of the parts, hardware and straps, and assembly steps for the platform and ladder.

The ten-step installation instructions for the Ladderstand– which are apparently similar industry-wide – appear next in the user manual:

| | |
|---|---|
| [ ] **WARNING** | [ ] **WARNING** |
| Failure to read and follow these instructions and DVD may cause serious injury or death. | Installing a ladderstand **requires 3 adults minimum.** |

**Step 1** Locate a healthy and straight tree that is between 9" and 20" in diameter . . . .

**Step 2** Place the assembled treestand on the ground, seat side down, with the bottom ladder section pointed towards the tree . . . .

---

3. Next to each of the warnings is an orange triangle with an exclamation mark – ⚠ – which the Court has substituted with brackets.

**Step 3** Attach the (2) long ends of the stabilizer (criss-cross) straps to each side of the lower rear frame tube on each side of the tree claw. These long stabilizer straps should be attached by pulling the free end of the strap through the loop end of the strap to create a choker knot around the frame tube . . . .

[ ] **WARNING – Three adults or more are required to install and/or take down a ladder treestand.**

**Step 4** Using at least 3 adults, pick up the platform end and gently raise the stand and lean it against the tree so that the tree claws come into contact with the tree . . . .

**Step 5** While two persons hold the stand in place, the third person should install the Horizontal Support Bar assembly between the tree and the ladder. Attach the Horizontal Support Bar to tree and ladder at the highest ladder rung reachable from the ground. Secure the Horizontal Support Bar to the tree with the Cam-Lock Buckle strap as shown in Figure 12.

**Step 6** Lightly bounce on the first rung to set the ladder into the ground while helpers hold the stand in place . . . .

**Step 7** With the stand level and being held in place by two persons, cross one of the long stabilizer straps behind the tree and connect it to the ladder column tube at the highest point reachable from the ground. Criss-cross the other long stabilizer strap, forming an "X" pattern on the back of the tree, and connect it to the opposite ladder column at the highest point reachable from the ground. See Figure 13 . . . .

[ ] **WARNING – The criss-cross straps and stabilization bar (devices) must be attached and installed correctly, with two persons stabilizing the ladder, before climbing to the platform the first time**. If you are not wearing a full body harness to protect you from a fall, do not leave the ground.

**Step 8 STOP! – Put on your Fall Arrest System; Full Body Harness NOW!**

[ ] **WARNING –** When hunting from a treestand, falls can occur any time after leaving the ground causing injury or death! Therefore, you must always wear a fall arrest system (FAS) comprising a full body harness at all times after leaving the ground.

**Step 9** Climbing the ladder for the first time-
        **Prior to climbing the ladder for the first time you must:**
            [ ] **Have three adults, two adults holding the ladder / stand in place during the climb.**



[ ] **Have the horizontal support bar and stabilizer, criss-cross, straps installed correctly.**
[ ] **Have your (FAS), Full Body Harness and suspension relief device on.**
[ ] **Remember to maintain three points of contact when climbing the ladder[.]**
[ ] **Remember to always lean forward as you climb.**

[ ] **IMPORTANT!** Carefully climb the ladder. Upon reaching the top of the ladder, **BEFORE** stepping onto the platform and **BEFORE** securing the platform to the tree, **IMMEDIATELY** attach your full body harness safety strap to the tree. Failure to follow this warning may result in serious injury or death!

**Step 10 AFTER** you have securely attached your safety strap and full body harness to the tree, attach the main lower platform ratchet strap by running the free end around the tree and then though the ratchet end. Tighten the ratchet strap to secure the platform to the tree. Attach the second ratchet strap in the upper position, in the same way, if your model requires two straps.

Your stand is now secured to the tree and ready for use.

*Id.* at 9-10 (emphasis in original). Following the step-by-step instructions, the user manual depicts diagrams and figures demonstrating how the stabilizer straps were to be crossed and connected to the Ladderstand and illustrating the attachment of the support bar assembly to the ladder and tree.

### B. The Incident

On October 18, 2013, Mr. Yoder carried the Laddderstand into the wooded area behind his home to install. Mr. Yoder then selected a tree (apparently with a fifteen-inch lean), positioned the ladderstand against it, and allegedly installed the stabilizer bar.[4] A series of apparent missteps followed: Mr. Yoder did not first install the criss-cross straps to secure the Ladderstand to the tree, he did not have any adult (let alone two) hold the ladder / stand in place

---

4. Defendants' "hunting and safety expert" Lorne ("LJ") Smith, Jr. opined that Mr. Yoder attached the horizontal brace to the ladder rung without also attaching it to the tree. In his opinion, "[i]f this brace had been attached to the tree there would be damage to both the brace and the ladder rung but there is none so the brace was not attached to the tree." Aff. of Lorne Smith, Jr. at 2, Defs.' Ex. 7.

during the climb, and he did not connect his safety harness to the tree.  *See* Dep. of Mr. Yoder at 73, Defs.' Ex. 8. ("Q So were you wearing your safety harness?  A I wasn't wearing it. I had the strap that goes on the tree.  Q Okay.  A I had nothing to attach it to.").  Nevertheless, Mr. Yoder proceeded to climb the ladder to install the ratchet straps.

After Mr. Yoder reached the top of the Ladderstand, it collapsed and he fell to the ground.  Mr. Yoder's only recollection is sensing the Ladderstand "start to sink and then coming to on the forest floor."  As a result of his fall, Mr. Yoder sustained several injuries, including eight broken ribs, a bruised lung, a broken pelvis, and emotional trauma.  Mrs. Yoder allegedly witnessed the entire incident.  This litigation followed.

### C.  Procedural History

Plaintiffs commenced this action on June 13, 2014 by filing a seven-count Complaint in the Court of Common Pleas of Allegheny County, alleging state law claims for negligence, strict liability and breach of warranty against Defendants as well as a loss of consortium claim brought by Mrs. Yoder.  Defendants removed the action to this Court based on its diversity jurisdiction.

Plaintiffs have since retained James L. Glancey, Ph.D., P.E. as an expert witness to offer his opinion regarding the cause of the Ladderstand's collapse.  In that capacity, Dr. Glancey has co-authored an expert report along with Jack R. Vinson, Ph.D., P.E.[5]  Defendants have filed a motion to preclude Dr. Glancey from testifying at trial as well as a motion for summary judgment, which Plaintiffs oppose.

---

5. Among their experts, Defendants have retained George M. Saunders, Jr., P.E., C.F.E.I.  Mr. Saunders has opined that "[t]he ladder collapsed in this case due to buckling," which he attributes to "Mr. Yoder's improper installation and not a malfunction of the treestand."  Aff. of George Saunders, Defs.' Ex. 9 at 3-4; *see also id.* ("It would be physically impossible for the treestand to collapse in the manner observed if it were installed in accordance with the manufacturer's instructions.").  Moreover, Mr. Saunders determined that "Mr. Yoder utilized the treestand without the installation straps properly installed, and with various modifications in the installation of the treestand."  *Id.* at 4.  Defendants' other expert, Mr. Smith, concurred in this assessment.  *See* Aff. of Lorne Smith, Jr., Defs.' Ex. 7 ("Because Mr. Yoder did not attach the straps to the horizontal brace or attach the criss-cross straps, this allowed the stand to pull away from the tree when his weight was applied at the top allowing the stand to fall to the ground.").

## II.    Legal Standards

### A.  Federal Rule of Evidence 702

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (citing *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).  Thus, whenever a party seeks to admit expert testimony at trial, the district court must make an initial preliminary determination "that the requirements of Fed. R. Evid. 702 have been met." *Magistrini v. One Hour Martinizing Dry Cleaning*, 68 F. App'x 356, 356 (3d Cir. 2003) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Moreover, the United States Court of Appeals for the Third Circuit has interpreted Rule 702 as having "three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda*, 520 F.3d at 244 (citing *Kannankeril*, 128 F.3d at 806).  Our Court of Appeals has also "interpreted the second requirement to mean that 'an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.'" *Id.* (citing *Kannankeril*, 128 F.3d at 806 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994)).

The qualification prong of Rule 702 "requires 'that the witness possess specialized expertise.'" *Id.* (citing *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)). The Court of Appeals has "interpreted [this] requirement liberally." *Id.* (citing *Schneider*, 320 F.3d at 404; *Paoli*, 35 F.3d at 741). It has explained that "a 'broad range of knowledge, skills, and training'" can suffice to "'qualify an expert.'" *Id.* (quoting *Paoli*, 35 F.3d at 741). "This liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (citing *Paoli*, 35 F.3d at 741). The Court of Appeals has repeatedly "stated that 'it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'" *Kannankeril*, 128 F.3d at 809 (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)).

"The second requirement is that of reliability." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 788 (3d Cir. 2009). In evaluating whether a particular methodology is reliable, the Court of Appeals has identified several factors district courts should consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* (citing *Paoli*, 35 F.3d at 742 n.8). However, these factors "'are neither exhaustive nor applicable in every case.'" *Id.* (quoting *Kannankeril*, 128 F.3d at 806-07). Whether they are relevant "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). This inquiry remains

inherently "flexible." *Pineda*, 520 F.3d at 247 (quoting *Daubert*, 509 U.S. at 594). The question "is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000). The goal is simply "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Therefore, the focus must remain "on principles and methodology, not on the conclusions generated by the principles and methodology." *In re TMI Litig.*, 193 F.3d at 665 (citing *Kannankeril*, 128 F.3d at 806). "'The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination.'" *Id.* (quoting *Kannankeril*, 128 F.3d at 806).

"The third element under Rule 702, namely, whether the expert testimony would assist the trier of fact, "goes primarily to relevance.'" *Meadow*, 306 F. App'x at 790 (*quoting Lauria v. Amtrak*, 145 F.3d 593, 599 (3d Cir. 1998). This element requires that "[t]he expert's testimony must 'fit' under the facts of the case so that 'it will aid the jury in resolving a factual dispute.'" *Id.* And "[t]he standard for the factor is not high; it is met when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Id.* (citing *Lauria*, 145 F.3d at 600 (quoting *Paoli*, 35 F.3d at 745)); *see also In re TMI Litig.*, 193 F.3d at 670 ("[A]dmissibility depends, in part, on a connection between the expert opinion offered and the particular disputed factual issues in the case.") (citation omitted). Therefore, "expert testimony based on assumptions lacking factual foundation in the record is properly excluded" under the fit requirement in addition to the reliability requirement.

*Meadows*, 306 F. App'x at 790 (citing *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)).

### B. Federal Rule of Civil Procedure 56

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To withstand a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact for trial by citing to particular parts of material in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). *See Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248. *See Matsushita*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.");

*see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.").

The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c)(1)(A), or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," Fed. R. Civ. P. 56(c)(1)(B). In reviewing all of the record evidence submitted, the court must draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

The court is not permitted to weigh evidence or to make credibility determinations at this stage. *Anderson*, 477 U.S. at 255. Those functions are for the jury, not the court. *Id.* The court is thus limited to deciding whether there are any disputed issues and, if so, whether they are both genuine and material. *Id.*

## III.    Discussion

Defendants seek to preclude Plaintiffs' expert, James L. Glancey, Ph.D., P.E., from testifying at trial and move for summary judgment on all of Plaintiffs' claims.[6] The Court will address these motions seriatim.

---

6. Although the parties never mention the loss of consortium claim brought by Mrs. Yoder, the Court notes that "Pennsylvania courts have long held that an action for loss of consortium is derivative." *Scattaregia v. Shin Shen Wu*, 495 A.2d 552, 553 (Pa. Super. Ct. 1985). *See also O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 318 (3d Cir. 2007) ("Because the two claims 'together . . . represent the total, compensable damages—direct and indirect— suffered as a result of the principal plaintiff's injury,' we need not analyze them separately.") (quoting *Scattaregia*, 495 A.2d at 553).

### A. Motion to Preclude Dr. Glancey from Testifying at Trial

Dr. Glancey presently serves as a Principle with Mechanical Design and Forensic Analysi,s LLC and as a Professor in the Departments of Bioresources Engineering & Mechanical Engineering at the University of Delaware where he has been a faculty member since 1991. In addition, Dr. Glancey has received several other academic appointments at the University of Delaware – Faculty Member, Center for Biomedical Engineering Research; Affiliate Faculty, Center for Composite Materials; and Engineering Specialist, Cooperative Extension Service. Throughout his career, Dr. Glancey has received recognition and awards from his peers and students, presented numerous invited lectures, and published a litany of journal articles, peer reviewed proceedings, manuscripts, abstracts, and research papers in both refereed and non-refereed publications. Dr. Glancey also has been awarded several (provisional) patents and consulted as an expert witness on nearly one-hundred cases.

Plaintiffs have retained Dr. Glancey to offer opinions regarding the design of the Ladderstand as well as the warnings and instructions co-packaged with the product. Thus, Dr. Glancey's report includes a "Structural Analysis" as well as an "Evaluation of Warnings" and an "Evaluation of Installation Instructions."

The Structural Analysis proceeds from the premise that "the mode of failure of the side rails appears to be buckling," given that "there was no apparent structural damage to the subject tree stand prior to or during installation." Pls.' Ex. A at 6. As such, Dr. Glancey's conducted "an Euler buckling analysis" to "determine the buckling characteristics of the tree stand side rails." *Id.* In doing so, Dr. Glancey found that "[t]he corresponding critical buckling load for a side rail is 269 lbs." *Id.* at 7. Dr. Glancey further explained that, the "magnitude of the[ ] momentary compressive loads" imposed by climbers on ladders "can be as high as three times

the weight of the climber," which, in this case, equates to 792 pounds. *Id.* As Dr. Glancey concludes, "even if the loads imposed by Mr. Yoder on the tree stand ladder were equally distributed between the left and right side rails, failure was foreseeable and likely. In other words, under this scenario, the factor of safety for this tree stand design is less than one, far below acceptable for any climbing device or product." *Id.* And to Dr. Glancey, "[t]his constitutes a design defect in the subject tree stand." *Id.*

Dr. Glancey also identifies a second alleged design defect: the smooth contact surface of the horizontal support bar that contacts the tree "provides minimal – if any – resistance to vertical movement under compressive loads." *Id.* In contrast to the "'tree claw' at the back of the platform which promotes a positive 'lock' between the tree stand platform and tree," Dr. Glancey found that "[t]he smooth end of the support bar provides no locking type-interaction with the tree," making it "much more likely to slip during use." *Id.*

Dr. Glancey's evaluation of the warnings on and the installation instructions for the Ladderstand also highlight alleged defects. In particular, Dr. Glancey focuses on two identical warning labels – one on the outside of the right side rail between the first and second step; the other on the top of the fourth step – which are not visible to a climber as s/he approaches. The content of the warnings/label are, in Dr. Glancey's opinion, defective because there are "no instructions pertaining to the installation of the stand against a tree" and "no warning related to the initial ascent of the ladder prior to attaching the fall protection system to the tree." *Id.*

Additionally, Dr. Glancey opines that the installation instructions are "lacking" due to the absence of details regarding the location, positions, lifting points, etc. of the two adults who are supposed to hold the ladder when the climber ascends for the first time. Nevertheless, Dr. Glancey opines that "given that the mode of failure of the tree stand ladder was buckling, it is

unlikely – if not impossible – to prevent this mode of failure by holding onto the ladder." *Id.* at 8.

Based on these evaluations, Dr. Glancey ultimately concludes, "to a reasonable degree of engineering certainty," that the Ladderstand "possesses design and warnings defects such that the ladder side rails are prone to buckling under foreseeable loads imposed by a climber." According to Dr. Glancey, "[t]hese fundamental defects caused the ladder . . . to buckle prior to the installation of the fall protection system, and are the proximate cause of Mr. Yoder's injuries." *Id.*

Defendants seek to exclude Dr. Glancey as an expert. From their perspective, Dr. Glancey only calculated the load necessary for one unsupported ladder rail to bend, without also considering the use and impact of the Ladderstand's component parts, such as the second rail, the criss-cross straps, the ratchet straps, and the stabilizer bar. When those component parts are properly installed and attached to a tree, Defendants contend that the Ladderstand has a working load of 1,272 pounds. Defendants attribute Dr. Glancey's so-called faulty analysis to his unfamiliarity with a ladder treestand (he has never assembled, installed, or hunted from a treestand) and his lack of experience with this industry (he has never worked for or been consulted by an outdoor product manufacturer in the design or manufacture of a treestand). Further, Defendants suggest that Dr. Glancey never fully reviewed the Ladderstand as part of his analysis, as he failed to examine its engineering drawings, testing documentation, Member Certification Report, or co-packaged safety DVD and failed to consider industry standards for commonly-accepted ladderstand designs. Accordingly, Defendants submit that Dr. Glancey is not qualified to render opinions concerning the Ladderstand and that his analysis is otherwise flawed.

In addition, Defendants attempt to rebut Dr. Glancey's claims regarding the warnings by pointing to the user manual and Mr. Yoder's apparent misuse of the product. As Defendants (correctly) highlight, "[t]he clarity of the instructions belie [Dr.] Glancey's postulation." Defs.' Br. at 7. To be sure, the installation instructions set forth in the user manual, which is extensively detailed above, describe the necessary steps to connect the co-packaged criss-cross straps to the rear of the platform while the Ladderstand is on the ground and depict several pictures showing how the user is to accomplish that step.

Be that as it may, Dr. Glancey does not allege that additional or more conspicuous warnings would have changed Mr. Yoder's behavior or reduced or prevented the incident. Rather, Dr. Glancey proposes a redesign of the installation procedures to include, for example, "the use of a second, secure climbing device like an appropriately sized extension ladder" to prevent "the hazard that led to the injuries to Mr. Yoder" – an alleged design defect for which Dr. Glancey offers nothing more than his ipse dixit. *Id.* at 8. As for the user manual, Dr. Glancey similarly opines that it contains no details regarding the two adults who are supposed to assist, while conceding that also more detailed instructions could not prevent buckling – the purported mode of failure in this case. It is thus apparent to the Court that Dr. Glancey's opinions regarding the warnings/instructions do not meet the fit requirement of Rule 702. In other words, they will not aid the jury in resolve a factual dispute in this matter.

The Court also finds that Dr. Glancey's opinions regarding the alleged design defect do not pass muster under Rule 702's reliability standard. Dr. Glancey's report only calculates the critical buckling load for an unsupported side rail – one section of one part of the Ladderstand – apparently discounting the other side rail and the load borne by a properly selected tree. Dr. Glancey also fails to consider the proper installation and use of the criss-cross straps, ratchet

straps, or stabilizer bar – all of which also support the ladder as designed. The list of omissions from his analysis does not stop there, however. Making matters worse, Dr. Glancey never conducted any testing on the subject Ladderstand, reviewed its engineering drawings, or saw any of the testing documentation for this product, including the Member Certification Report certifying that this Ladderstand met and/or exceeded the Treestand Manufacturers Association's testing standards. Yet somehow Dr. Glancey still labels the design of the entire product defective. In short, "the analytical gap between the data and the opinion proffered is too great and is connected only by the ipse dixit of the expert, not by any evidence." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009).

Dr. Glancey's opinion as to a second possible design defect—in the design of the horizontal stabilizer bar—suffers from similar flaws. For instance, Dr. Glancey acknowledged at his deposition that he saw no physical damage on the support bar evidencing that it pulled apart. Nor did he ever inspect the strap allegedly used to connect the stabilizer bar to determine whether the strap slipped or the ratchet failed. And nowhere in his report does Dr. Glancey test his theory that the smooth end of the support bar makes it "much more likely to slip during use."

In order to withstand scrutiny under *Daubert* and its progeny, Dr. Glancey had to offer some basis from which to conclude that the Ladderstand was defectively designed, and he failed to do so. The Court does not doubt that the general mechanical engineering principles that Dr. Glancey relies upon apply to the ordinary ladder.[7] The Court also does not doubt Dr. Glancey's

---

7. Plaintiffs emphasize that "Defendants do not contend that Dr. Glancey's method for calculating the critical buckling load (Euler buckling analysis) is unreliable," and thus "it is irrelevant whether the expert has proven his conclusions: '[t]he focus . . . . must be solely on principles and methodology, not on the conclusions that they generate.'" Pls.' Br. at 8 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-95 (1993)). Although true as a general principle, "'conclusions and methodology are not entirely distinct from one another.'" *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). On the contrary, when assessing reliability, an expert's conclusions must be examined to decide "'whether they could reliably flow from the facts known to the expert and the methodology used.'" *Id.* (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)). If there is a "'too great a gap

18

qualifications in this area. Dr. Glancey does not, however, explain how the critical buckling load for one unsupported ladder rail is indicative of a defect in the product as a whole, designed to be used with all of its component parts. Nor does he explain how he ruled out other possible causes of the failure, such as Mr. Yoder's misuse. At most, Dr. Glancey's analysis shows the critical buckling load for a Ladderstand used by a climber without its critical components. Without more, the Court cannot conclude that Dr. Glancey's opinions meet the requirements of Federal Rule of Evidence 702. Accordingly, the Court will grant Defendants' motion to bar Dr. Glancey's testimony.

### B. Motion for Summary Judgment

The law is well established in Pennsylvania that a plaintiff must prove, as a necessary element of his products liability action, a causal connection between the injuries he allegedly sustained and the alleged defect in the product, regardless of whether the claim sounds in negligence, strict liability or breach of warranty. *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 937 n.23 (3d Cir. 1999). A plaintiff may be unable to do so where, as here, a district court excludes his expert from testifying at trial. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 159 (3d Cir. 2000). As the United States Court of Appeals for the Third Circuit has explained:

> [e]xpert evidence is not necessary . . . if all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training of the subject under investigation.

*Id.* At the same time, however, "a corollary to this principle *is* the notion that expert testimony is generally required in products liability cases where a defect is alleged, unless the issues are

---

between the data and the opinion proffered,'" the opinion should be excluded. *Id.* (quoting *Joiner*, 522 U.S. at 519). The Court is thus not required to "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Joiner*, 522 U.S. at 146.

'simple' and 'within the range of comprehension of the average juror.'" *Westfield Ins. v. Detroit Diesel Corp.*, No. 3:10-CV-100, 2012 WL 1611311, at *3 (W.D. Pa. May 8, 2012) (citing *McCracken v. Ford Motor Co.*, 392 F. App'x 1, 3 (3d Cir. 2010)) (emphasis in original). "Thus, courts routinely require plaintiffs to support their claims with expert testimony when the subject matter is highly technical and beyond the jury's understanding." *Id.* (citing *Oddi*, 234 F.3d at 159 ("We do not believe that a juror could look at the front bumper and the flooring of the cab of the truck [plaintiff] was driving and reasonably conclude, not only that its design was defective, but also that testing would have disclosed the defect and that it could have been remedied. Such conclusions are within the peculiar competence of experts."); *McCracken*, 392 F. App'x at 3; *Marino v. Maytag Corp.*, No. CIV.A. 02-2085, 2005 WL 2403638, at *4 (W.D. Pa. Sept. 29, 2005) ("On this record, the court concludes that a juror could not look at the mechanical drawing without expert testimony to explain it, listen to the testimony of the plaintiff and his expert testify regarding safety warnings generally, and reasonably conclude that not only was the dishwasher's design defective, but also that the dishwasher was a substantial factor in causing plaintiff's injury.").

As in those cases, the Court finds that a juror could not look at the Ladderstand used by Mr. Yoder and reasonably conclude that its design was defective. The engineering and design of the Ladderstand and the interworking of its component parts are all technical in nature, as are the concepts of dynamic force, momentary compressive loads, and factor of safety, to name just a few. Without expert testimony or an independent knowledge of mechanical engineering, a juror could, at most, speculate as to Plaintiffs' theory of liability. "Absent proof of what caused the [incident], Plaintiff[s] cannot prevail on any of [their] theories of recovery, whether they sound in strict products liability, negligence, or breach of warranty." *Westfield Ins.*, 2012 WL 1611311,

at *4.  Accordingly, the Court will enter summary judgment in Defendants' favor as Plaintiffs do not present admissible expert evidence to establish a prima facie case on their product liability claims.  The Court will also enter summary judgment on Mrs. Yoder's loss of consortium cause of action, as it is derivate of those claims.

IV.    **Conclusion**

For the reasons hereinabove stated, the Court will grant Defendants' motion to preclude Dr. Glancey from testifying and grant their motion for summary judgment.  An appropriate Order follows.

McVerry, S.J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JASON K. YODER and MARILYN YODER**, *his wife*, | ) |
| | ) |
| | ) |
| **Plaintiffs,** | ) **2:14-cv-937** |
| | ) |
| **vs.** | ) |
| | ) |
| **THE SPORTSMAN'S GUIDE, INC.**, *d/ba/a GUIDE GEAR*; and **DIRECT OUTDOOR PRODUCTS, LLC,** | ) |
| | ) |
| | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## ORDER OF COURT

AND NOW, this 12th day of November, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 30) is **GRANTED** and DEFENDANTS' MOTION TO PRECLUDE JAMES GLANCEY FROM TESTIFYING AT TRIAL (ECF No. 31) is **GRANTED**.  The Clerk shall docket this case **CLOSED**.


BY THE COURT:

s/Terrence F. McVerry
Senior United States District Judge


cc:   **Peter D. Friday, Esquire**
      Email: pfriday@fridaylaw.com

      **Bishop A. Bartoni, Esquire**
      Email: bbartoni@clarkhill.com
      **Milton S. Karfis, Esquire**
      Email: mkarfis@clarkhill.com
      **Vincent M. Roskovensky, Esquire**
      Email: vroskovensky@clarkhill.com